UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
DEVELOPMENT SPECIALISTS, INC.,
in its capacity as Plan          :
Administrator for Coudert
Brothers LLP,                    :          MEMORANDUM & ORDER

           Plaintiff,     :          11 Civ. 5984 (CM)(MHD)

       -against-            :

DECHERT LLP,                     :

        Defendant.      :
--------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


    Plaintiff Development Specialists, Inc. ("DSI") is the plan

administrator for the bankruptcy estate of the law firm Coudert

Brothers LLP ("CB"). It commenced this lawsuit against Dechert LLP

to recover funds that it alleges Dechert owes to the bankrupt's

estate as a result of the migration to Dechert of lawyers and

business from CB and its Paris branch Coudert Freres ("CF") at the

time of the collapse of the Coudert firm and in the wake of an

asset purchase agreement between the two firms in 2005.


    Plaintiff has sought to pursue a series of fraudulent-

conveyance claims against Dechert, all involving business generated

or handled originally by CB or CF. One aspect of the case arises

1

from an effort by DSI to obtain reimbursement for so-called "unfinished business" that originated with CF. See Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP, 477 B.R. 318 (S.D.N.Y. 2012). Discovery has proceeded apace on the fraudulent-conveyance claims generally, but was suspended on the unfinished-business portion of the case while the legal viability of that type of claim was addressed on certification by the New York Court of Appeals, which recently held that such a claim was not legally sustainable. See In re Thelen, __ N.Y.3d __, 2014 WL 2931526 (N.Y. Ct. App. July 1, 2014). This bifurcation of discovery was adopted because document production on "unfinished business" would likely raise substantial issues of attorney-client privilege and client confidences under French and probably domestic law. (See Dec. 18, 2013 Tr. 2-4).

In the midst of this portion of discovery -- which is now virtually complete -- a dispute arose between the litigants over a demand by Dechert that plaintiff surrender to it a set of computer back-up tapes that Dechert believes will contain documents that Dechert claims are, or may be, covered by a privilege belonging either to Dechert clients or to Dechert or by a rule of client confidentiality that protects Dechert clients. The documents in question are said to have originally resided on a computer system

2

in the CF office, which for a time in late 2005 and early 2006 was taken over by Dechert during the process of transitioning business from CF to Dechert and closing up CF. Apparently Dechert left the computer system, including the data that it housed, in the Paris office when it vacated the premises, and the server is no longer available. There are, however, some back-up computer tapes that the Coudert firm had in its possession and that subsequently came into the possession of the debtor's estate. Dechert is seeking an order requiring DSI to turn the tapes over to it so that it may review them and determine which documents residing on them are covered by the attorney-client privilege or a client-confidentiality rule. It would then apparently return to DSI the remaining portions of the tapes.

DSI has opposed this application. In doing so, it argues that Dechert has made no showing that any identifiable documents are subject to a privilege or other rule of confidentiality despite a court order requiring such specificity; indeed, it says, Dechert has not even identified what body of privilege law would apply to such documents. DSI further argues that Dechert cannot be heard to demand that plaintiff simply turn over the tapes to Dechert to review, as the tapes contain privileged material pertaining to non-Dechert clients. Further, as a practical matter, plaintiff says

3

there is no feasible way for it to separate out documents that might be privileged or confidential and that pertain to work undertaken for Dechert clients (presumably clients who migrated from CF to Dechert) because Dechert and CF documents are intermingled on the tapes. Finally, DSI insists that Dechert's demand is unenforceable because Dechert was in effective control of the Paris office from October 2005 to early January 2006 -- nearly a decade ago -- and simply abandoned what it now claims are privileged or confidential documents, thus waiving any claim for the custody of these documents.

Apart from DSI's arguments in opposition to this application, it has also represented that in reviewing documents from the back-up tapes for the purpose of production to Dechert in this litigation, its counsel has deliberately put aside, and not reviewed, any documents that appear likely to constitute privileged communications or client confidential materials relating to Dechert clients. (Mar. 13, 2014 Tr. 13; Mar. 20, 2014 letter from David J. Adler, Esq. at 4; Apr. 23, 2014 Tr. 29-31). Thus it represents that the documents that it has reviewed and produced to defendant pertain only to such matters as billings, fees, expenses, the transfer of business from CF to Dechert and other related matters. (Id.).

4

The Factual Record

In 2005, the Coudert firm (inclusive of CF)[1] was in the process of dissolving. In the course of the firm's windup it entered into an asset purchase agreement with Dechert, effective October 27, 2005, under which CB paid a sum of money and transferred various parts of its business -- including both assets and liabilities -- to Dechert. (Miller Mar. 28, 2014 Decl. Exs. C & D). At the same time, a number of CF partners and other staff chose to transfer to Dechert, which had its own Paris branch. (Nyssen Mar. 28, 2014 Decl. ¶ 3).

Because Dechert's Paris office did not have sufficient space to house the transferees from CF, it decided to leave them in place in the CF office during a transition period, which was to end in early January 2006. At the same time, some attorneys and others from CF who were not transitioning to Dechert also remained in that office. (Id. ¶¶ 4-5).

---

[1] At one point there was an issue in the case as to whether CF is so related to CB that their finances should be treated as consolidated, but the District Court upheld the plaintiff's allegations to that effect on a Rule 12(b)(6) challenge. See Development Specialists, Inc. v. Dechert LLP, 2013 WL 4573733, *6-*7 (S.D.N.Y. Aug. 22, 2013). The court subsequently granted an unopposed application for consolidation. (Endorsed Order dated Mar. 18, 2014).

For this transition period, Dechert chose not to lease or purchase a separate computer to house data that was to be created or addressed to the new Dechert personnel, and instead opted to use the computer system of CF, which it shared with the remaining CF lawyers and other personnel, albeit with Dechert in control of the "IT infrastructure". (Nyssen Decl. Ex. A at 2). To honor the firms' respective obligations to maintain confidentiality for their own clients, Dechert and CF apparently agreed on a protocol, or at least the principal terms of a protocol, which sought to keep their computerized data -- including e-mails and other documents -- separate on the joint server. (Id. ¶¶ 6, 8-9 & Ex. A ("the IT Memo")). As Dechert indicates, this was especially important because French law -- which presumably governed the conduct of the Paris attorneys -- is particularly protective of the confidentiality of client information, extending such a rule beyond the universe of communications traditionally protected by the attorney-client privilege as recognized in United States legal systems. (Id. ¶ 7).

Most of the pertinent details of the arrangement between the two firms are reflected in a draft IT memo (id. Ex. A), although that document is, on its face, partly incomplete. (Id. Ex. A at 6). In substance, a new set of e-mail addresses was created for the new

6

Dechert personnel, although they were able to access their old CF e-mail accounts as well. (Jegou Mar. 28, 2014 Decl. ¶¶ 12-14). As for other documents, the IT memo referred to the intention to create a separate DocsOpen database for the new Dechert personnel. (Nyssen Mar. 28, 2014 Decl. Ex. A at 2, 7). The record is not altogether clear whether that was done, but there is evidence that at least a separate folder or set of folders was created and labeled as referring exclusively to Dechert. (Adler June 2, 2014 letter at 4). It appears that personnel on both sides of the line dividing these two firms could access certain portions of the others' databases, although the IT memo recites that each firm's personnel were committed to honoring the ethical requirements that prohibited accessing of any client materials without client permission. (See Jegou Mar. 28, 2014 Decl. ¶¶ 8-15).

The record is not altogether clear as to who was involved in making these arrangements, but it is plain that one person intimately involved from a technical standpoint was Samuel Jegou, who is Dechert's IT Manager for Europe, the Middle East and Asia. (Id. ¶ 1). Significantly, until the transaction in question, Mr. Jegou had been the IT Manager for CF, and thus plainly was fully informed at all times of the technology issues presented by the transaction as it unfolded. (Id. ¶¶ 1, 7).

7

One aspect of the CF technology system that Dechert left in place and presumably chose to rely upon was the use of so-called back-up tapes to ensure the preservation of data in an emergency. Mr. Jegou initially asserted that CF had five such tapes and that these tapes were used in sequence and swapped daily and were overwritten by new data when full. (Jegou Decl. ¶¶ 15-16). The record reflects, however, that CF had monthly and annual tapes that were not overwritten. (Brandt Apr. 10, 2014 Decl. ¶¶ 6, 8; Adler Apr. 10, 2014 Decl. ¶¶ 2-4). Mr. Jegou was presumably fully aware of this practice at the time, since he headed the IT department of CF and was party to, or author of, communications back in 2005 referring to the fact that CF had such a system. (Adler Apr. 10, 2014 Decl. Exs. A, B; Brandt Apr. 10, 2014 Decl. Ex. A).

In early January 2006, when the transition period was ending and Dechert had acquired more space elsewhere, it and its new personnel departed from the CF premises. (See Jegou Mar. 28, 2014 Decl. ¶ 4). In doing so, it appears that Dechert did not seek any arrangement by which to retain custody of such data as was on the office server or to delete that data on the server, which it left behind. It also made no provision for safeguarding any of the client confidences or other possibly protected materials reposing on the back-up tapes.

8

By late January 2006, all of the remaining CF personnel had apparently departed the Paris office as CB ceased to engage in normal business activity. (See Mar. 13, 2014 Tr. 8-10). According to DSI's counsel, during the same month, the Paris landlord began eviction proceedings, culminating in an auction of property left on site at the office. (Apr. 23, 2014 Tr. 27-28). What happened to the server is unknown. Counsel speculate that it was either retrieved by the lessor of the system or sold at auction or discarded. (Id. at 27). As noted, the record does not reflect any effort by attorneys or other personnel of Dechert to delete from the database of the server any materials originally on it, and it is to be assumed that this data was at least potentially accessible by anyone who assumed possession of the equipment. As for the back-up tapes, they were apparently retained by someone associated with CB, since the tapes ended up in the hands of the administrator of the CB bankruptcy estate, but the chain of their custody is not disclosed on the record.

The years passed, and it was only after the filing of this lawsuit by DSI that the question of the status of documents reposing on the tapes arose. The existence of the back-up tapes was first addressed last year when Dechert asked that DSI conduct an ESI search using agreed-upon terms. DSI advised that it had no

9

access to the Paris server but that it had the back-up tapes, and it agreed to run the search on them. (Adler Apr. 10, 2014 Decl. ¶¶ 6-11). This produced a quantum of documents that DSI had to review for relevance. Insofar as these documents were found relevant, DSI produced copies to Dechert. According to DSI, it did not consider documents that contained attorney-client privileged material to be relevant, and it put them aside without further review once counsel determined that they were of that nature. (Mar. 13, 2014 Tr. 13; DSI Mem. at 17).

In Dechert's first allusion to this issue before the court, it asserted that the computer system at the Paris office had belonged to CF, that it contained documents from both the CF and the Dechert practices, that after Dechert had taken over the office in October 2005 attorneys from both Dechert and CF had used the system, but that a firewall was put in place that kept the two bodies of data separate, and that CF eventually maintained a set of backup tapes that -- in the words of DSI's counsel -- "may contain internal communications within Dechert and communications between Dechert and its clients." (Miller Mar. 6, 2014 letter at 3-4 & Ex. C). Dechert noted that DSI was asserting that "any information restored from the backup tapes relating to the issues being litigated in the Dechert action are [DSI's] property and any possible claim of

10

confidentiality or privilege with respect to communications contained therein has been waived in any event." (Id. at 4 & Ex. C). In its first submission to the court, defendant contended that DSI's position was "a blatant violation of DSI's obligations under the federal rules." (Id. (citing Fed. R. Civ. P. 26(b)(5)(B))). Accordingly, Dechert sought assurance that DSI's counsel not review "privileged material", that is, material covered by a privilege for Dechert clients. (Id.).[2]

DSI responded that it had no obligation under cited inadvertent-production provisions of Rule 26 since the documents in question had not been produced to it in discovery. As for the pertinent facts, it said that it was unaware of any firewall in the Paris computer system, and hence that documents privileged to both CF and Dechert clients had been commingled on the system because Dechert had failed to keep them separate. DSI also represented that, at Dechert's request, it had restored the tapes and reviewed them, via an agreed-upon ESI protocol, in order to produce relevant documents to defendant. It further argued that any privilege had been waived by Dechert's failure to save or dispose of the system

---

[2] At a later point, Dechert's counsel told the court that Dechert itself might have an attorney-client privilege claim because it had consulted outside attorneys in 2005 concerning possible litigation against it. (Apr. 23, 2014 Tr. 11).

when it left the Paris office. (Mar. 12, 2014 letter from David J. Adler, Esq. at 7).[3]

After further back-and-forth correspondence with the court and a conference at which the parties laid out their respective theories as to what should be done with respect to the documents on the back-up tapes,[4] we declined Dechert's demand that DSI simply turn over the tapes to Dechert so that it could review them for privileged material. Nevertheless, we authorized the defendant to move formally for whatever relief it deemed appropriate. (Mar. 21, 2014 Order at 2-3).

We were subsequently gifted with a motion and reply by Dechert seeking the same relief or some variant of it and opposition papers by DSI. (Nyssen Mar. 28, 2014 Decl.; Jegou Mar. 28, 2014 Decl.; Miller Mar. 28, 2014 Decl.; Jegou Apr. 17, 2014 Decl.; Miller Apr. 17, 2014 Decl.; Brandt Apr. 10, 2014 Decl.; Adler Apr. 10, 2014 Decl.). Following briefing, we conducted a conference on April 23,

_____

[3] DSI also indicated that Dechert had admitted that it had collections of documents, some privileged, from three CF partners, and it demanded assurance that Dechert was not reviewing any of these privileged documents. (Mar. 12, 2014 letter from David J. Adler, Esq. at 7-8). Dechert subsequently denied having any such documents. (Mar. 13, 2014 Tr. at 20).

[4] See, e.g., Mar. 6, 2014 Miller letter; Mar. 12, 2014 Adler letter.

12

2014, at which we honored a request by Dechert to direct that DSI disclose to Dechert the e-mail file names for the relevant period pertaining to the new Dechert personnel and disclose the status of data reflecting non-email documents on the tapes. (Apr. 23, 2014 Tr. 43-44).[5] DSI complied, and additional letter briefing followed. (May 28 & June 11, 2014 Miller letters; June 2 & 23, 2014 Adler letters).

For the reasons that follow, we deny Dechert's motion, but impose certain conditions on our denial.

ANALYSIS

Defendant's motion is pursued in a somewhat unusual context. Although seemingly styled as a discovery motion, replete with references to the standards governing inadvertent disclosure in discovery, it does not readily lend itself to that sort of treatment. The tapes in question and the data reposing on them were not produced by Dechert to DSI in this lawsuit, or indeed at any other time. They were items that Dechert itself has characterized

---

[5] This step was taken principally to provide Dechert with information pertinent to the assertion of DSI that data of the two firms had been intermingled on the server and on the tapes and had not been separated by any firewall, as Dechert had originally -- and apparently inaccurately -- asserted.

as CB property which had reposed in the possession of the remnants of that firm and then its successor in interest -- the administrator -- for nearly a decade since Dechert abandoned the CF Paris office. Moreover, to the extent that the tapes contain data pertinent to the claims and defenses in this case, copies of that data have apparently been produced by DSI to Dechert.[6]

In substance, then, what Dechert appears to be attempting to do is to pursue an unpled substantive claim for return of property that it claims belongs either to it or to its clients or former clients. Indeed, this characterization is supported by the fact that even if DSI had never brought suit against Dechert, that firm could, at least in theory, have sought the same relief in an independent suit -- that is, a turnover from DSI of the portions of the tapes that contain assertedly privileged (or work product) material belonging to Dechert's clients or to the firm itself. Putting to one side whether such a claim -- whether in replevin or based on some other theory -- could conceivably avoid a time bar, its absence from the pleadings at least calls into question whether Dechert's motion can be sustained on the current state of the lawsuit. That said, we address the motion on the assumption that it

---

[6] Dechert has not proffered any complaint about the adequacy of DSI's document production in this respect.

14

presents a question that may be reached as a discovery issue.

Even if we view the current application loosely as coming within the broad authority of this court to manage discovery, the specific relief that Dechert seeks would be inappropriate. This is true not only because Dechert at least arguably waived any privilege or confidentiality by its failure to take even minimal steps to preserve the confidentiality of the data when it departed from the Paris office, but also because DSI's access to the tapes -- of which Dechert now complains -- was an inevitable consequence of Dechert's own conduct. Finally, we note that Dechert has failed to demonstrate that there is an efficient way to accomplish the sort of surrender of the tapes that it proposes, and in fact there is a far simpler way to protect the interests that Dechert seeks to honor by its motion.

In addressing these issues, we must initially note a possible inconsistency in the representations that DSI has made in the course of addressing the current motion. At various points its counsel has stated that the carelessness of Dechert in handling the sensitive data in 2005 and 2006 constitutes a waiver of all materials on the tapes, whether core attorney-client privileged materials (that is, communications between client and counsel to

15

facilitate the rendition of legal advice or other legal services),
or other documents that might (or might not) come within some
theory of privilege, work product or client confidentiality. (E.g.,
June 23, 2014 Adler letter at 1). At other times, DSI has been more
ambiguous on the point, possibly implying that the waiver argument
does not extend to materials that come within the scope of the
traditional attorney-client privilege. (See Apr. 23, 2014 Tr. 29-
30). These assertions have, however, been accompanied by consistent
representations that DSI views documents that come within the
privilege as not relevant to this case, and that plaintiff's
counsel have therefore not utilized or even reviewed these
materials once they have determined that they fit within this
category. (E.g., id.).[7]

Before addressing the waiver question, we take note of the
fact that Dechert has chosen to rest its arguments on the terms of
the IT memo, which it asserts represents adequate protection of the
confidentiality of its assertedly protected materials. That memo,
however, contained no provision for the handling of data on the
server or the back-up tapes at the conclusion of the transition
period. When questioned as to what Dechert expected would happen to

---

[7] According to plaintiff, the pertinent documents pertain to
fees, billings, transfers of cases from CF to Dechert and similar
materials. (E.g., Mar. 21, 2014 Tr. 13; DSI Mem. at 17).

the tapes after the firm left the Paris premises, Dechert's counsel responded, albeit somewhat tentatively, that defendant may have assumed that CF would continue to use the back-up tapes until it had no further need of them and then perhaps would dispose of them, even though no provision had been made for their destruction. (Apr. 23, 2014 Tr. 14-15). Since the tapes included CF protected material, and remained in the custody of CB and then, by legal processes, were transferred to the custody of the administrator, Dechert fails to demonstrate that CB or the administrator has done anything improper or unauthorized by it. Although DSI has utilized the tapes to provide discovery to Dechert -- as Dechert requested -- that is not contrary to any asserted and viable right of Dechert. Moreover, DSI has represented without contradiction that insofar as the tapes may contain potentially privileged Dechert materials -- that is, communications between client and counsel concerning legal matters handled by a Dechert attorney -- DSI's lawyers have set those documents aside and not reviewed them. None of this is inconsistent with the IT memo or with the legal obligations of CB or its successor in view of Dechert's decision to leave the tapes to CF.

As for the waiver question, in resisting DSI's argument, Dechert invokes the traditional analysis governing the handling of

17

assertions of inadvertent disclosure in discovery, and indeed it cites specifically to Fed. R. Evid. 502 and Fed. R. Civ. P. 26(b)(5)(B) as well as New York caselaw. (Dechert Mem. at 10-13; Dechert Reply Mem. at 5-7). In pressing this argument, Dechert emphasizes that it and CF took great care to ensure that each firm met its legal and ethical responsibilities in handling materials that were received or prepared or modified in the Paris office when both firms were there and using the same server. Thus it points to the IT memo as reflecting the arrangement undertaken by the firms during the transition period, and suggests that if no mention was made as to the back-up tapes, that was a minor and forgivable oversight.[8]

---

[8] Dechert makes an alternative argument to the effect that an attorney cannot waive a privilege belonging to a client. (Dechert Reply Mem. 6). Defendant's point seems to be that even if it was careless in its handing of assertedly privileged or confidential material, that failing cannot waive the attorney-client privilege, which belongs to the client. This argument fails. First, the cited principle appears to be limited to intentional disclosures of privileged materials. E.g., In re von Bulow, 828 F.2d 94, 100 (2d Cir. 1987)(client encouraged counsel's disclosure in published book); see also Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 442-43 (S.D.N.Y. 1995) (comparing various approaches of courts to issue of inadvertent disclosure). Second, the very legal doctrine that Dechert cites -- concerning inadvertent waiver -- makes plain that careless actions by counsel in not protecting privileged materials may permissibly be ascribed to the client for purposes of finding an implied waiver. See Dechert Reply Mem. at 6 (quoting Oakwood Realty Corp. v. HRH Constr. Corp., 51 A.D.3d 747, 749, 858 N.Y.S.2d 677, 679 (2d Dep't 2008)("no waiver where 'the client intended to maintain the confidentiality of the document [and] reasonable steps were taken to prevent disclosure

If we are to treat the current motion as one within our authority to manage discovery, the rules on inadvertent disclosure seem the most pertinent to apply, at least by analogy, to the waiver question, although, as DSI points out, they do not directly apply here since Dechert did not produce the tapes to DSI and indeed, according to its own accounts, never had custody of them. Nonetheless, since Dechert asks us in effect to deem it the functional equivalent of the producing party, we follow the defendant's lead by analogizing to the rules that they cite and the caselaw that has addressed inadvertent-disclosure issues.

Rule 26(b)(5)(B) does not address the substance of the analysis. Rather, it sets out the procedure to be followed if a producing party wishes to assert a privilege claim for materials already produced by it in litigation. In that case, the receiving party must "promptly return, sequester or destroy the specified information and any copies", but if it contests the validity of the producing party's attempted invocation of privilege it may

[and] the party asserting the privilege acted promptly after discovering the disclosure to remedy the situation [and] the parties who received the document will not suffer undue prejudice if a protective order against use of the document is issued.")(emphasis and bracketed material added); see also Mfrs. & Traders Trust Co. v. Servotronics, Inc., 132 A.D.2d 392, 400-01, 522 N.Y.S.2d 999, 1005 (4th Dep't 1987)(noting that absence of client approval for disclosure does not necessarily bar waiver finding); accord Bank Brussels Lambert, 160 F.R.D. at 442-43.

19

"promptly submit the information to the court under seal for a determination of the claim." As for the standards that the court must use to assess such a claim, Rule 502 lays out the traditional criteria, stating that "disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." As we will see, the criteria governing discovery provide only an uncomfortable fit for the analysis required in the current context.

In assessing whether production or other disclosure of privileged materials waives the privilege, the courts look to "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery and extent of the disclosure, and (4) overarching issues of fairness." S.E.C. v. Cassano, 189 F.R.D. 83, 85 (S.D.N.Y. 1999)(citing cases); accord, e.g., Business Integration Servs. v. AT&T Corp., 251 F.R.D. 121, 129 (S.D.N.Y. 2008)(citing cases). New York law follows substantially the same rule. See, e.g., Oakwood Realty Corp., 51 A.D.3d at 749, 858 N.Y.S.2d at 679. We address each of these considerations in turn.

20

In asserting that it took reasonable precautions "to prevent inadvertent disclosure", Dechert emphasizes the terms of the IT memo and, by inference, the handling of privileged documents during the transition period. There is no doubt that the IT memo, even in its incomplete form, documents the awareness of Dechert that it bore obligations to its clients (and, to the extent that Dechert itself was a potential litigant, to itself) to ensure that non-Dechert personnel did not have access to privileged communications with Dechert clients. We also infer that Dechert assumed that implementation of the terms of the IT memo, including the acknowledgment of both Dechert and CF that all personnel should observe ethical standards, was at least a necessary step in meeting its obligations. Whether it was a sufficient step is another matter.

Plainly stated, Dechert's conduct throughout the relevant period cannot be viewed as reasonable. It chose at the outset not only to share physical space with non-Dechert attorneys, but also to share its server with those lawyers, even though there was concededly no means of ensuring that the CF lawyers could not access at least some documents of the Dechert personnel. That decision may not in itself have been unreasonable considering the fact that Dechert's pre-existing office was not large enough to

accommodate the new lawyers, but it meant that care had to be taken to ensure that at the end of the transition period Dechert alone retained access to any protected materials relating to its legal practice. In that respect, it appears that Dechert failed to meet its responsibilities in at least two respects.

First, defendant apparently abandoned the joint server without taking any action to ensure either that the Dechert data on that system was removed or that the server itself was safeguarded from access by others. As a result of this failure, the ultimate fate of the server is unknown, and all of the data that Dechert currently seeks to retrieve was made potentially available to anyone who happened to take possession, whether temporary or permanent, of the server. In that respect, Dechert evidenced a complete disregard for safeguarding its data, no matter how reasonable it may have been in developing the IT memo to protect that data during the transition period.

Second, as noted, Dechert was on notice that all of the data being placed on the server was being recorded and saved on a set of back-up tapes that were apparently held by CF. That this is the case is evidenced by the fact that Dechert's IT Manager, Mr. Jegou, had been CF's IT Manager until the transition of law firm business,

22

apparently in October of 2005. Although Mr. Jegou initially proffered a declaration in this case referring to five daily tapes that were overwritten on a frequent basis, it turns out that DSI ended up with 60 monthly and annual tapes with data going back at least to 1998 (Apr. 23, 2014 Tr. 29; Brandt Apr. 10, 2014 Decl. ¶¶ 6-8; Adler Apr. 10, 2014 Decl. ¶¶ 2-4), and it is inconceivable that Mr. Jegou was unaware of the back-up system at the time of the transition.[9] Moreover, it must be inferred that, as IT Manager for the two firms, he was involved, or at least consulted, in the preparation of the IT memo that Dechert has proffered as the chief basis for inferring that it took reasonable precautions. Yet the IT memo offers no mention of the backup tapes, even though Mr. Jegou had memorialized their existence in a memorandum prepared less than two months before. (Brandt Ex. A). Dechert's disregard for the custody and safekeeping (or destruction) of the tapes reflects a further failure on its part to protect the privileged or confidential material that it now seeks to recover nearly a decade later.

Dechert may be heard to argue that its failure to safeguard or

---

[9] We note that Mr. Jegou disclaims only knowledge that Coudert had retained the tapes (Jegou Mar. 28, 2014 Decl. ¶ 17), not knowledge of the tapes or of Coudert's original custody of them.

23

deal with the server is not the cause of the asserted improper "disclosure" of the privileged documents to DSI. It also does argue that the failure to deal with the tapes was due to ignorance on its part as to their existence or significance or was simply a minor slip-up that should not be deemed a waiver. Neither argument is persuasive.

The failure with respect to the server may or may not have led to actual exposure of the privileged materials to others -- which would compromise a claim of privilege -- but Dechert bears the burden, when asserting a privilege, to demonstrate that the materials were maintained in confidence, e.g., United States v. Mejia, 665 F.3d 126, 132-34 (2d Cir. 2011)(client has burden to establish confidentiality was maintained); Nicastro v. New York Central Mut. Fire Ins. Co., 117 A.D.3d 1545, 1546, 985 N.Y.S.2d 806, 807 (4th Dep't 2014)(same), and it cannot do so in these circumstances. Moreover, its inaction with regard to the server is a clear indicator of its laxity in attempting to preserve such required confidentiality.

As for the tapes, Dechert was on notice through its own IT Manager of their existence and retention, and, once again, failed to take any steps to preserve their confidentiality. It is true

24

that CF apparently acknowledged in the unsigned IT memo its own ethical responsibilities, but that can hardly absolve Dechert. CF, as part of CB, was dissolving, and indeed that was the trigger for Dechert's acquisition of CF assets and personnel. Yet the IT memo was plainly designed to address only the transition period until Dechert left that shared Paris office and CF disappeared into the bankruptcy mists, and the memo made no provision for the tapes; indeed it never referred to them. It could hardly be deemed reasonable for Dechert, if it intended to maintain its materials in confidence, to simply hope that whoever obtained the tapes (or server) would never access or disclose the materials that they contained.[10]

As for the balance of the considerations traditionally invoked on a claim of inadvertent disclosure, they do not assist Dechert's motion. Although defendant asserts that it acted promptly to rectify the situation with the tapes -- dating the disclosure of the issue to its attorney in February 2014 -- that is not the case. As noted, Dechert had to know back in 2005, or at the latest in January 2006, that it was leaving the security of its data to an

---

[10] As noted, when quizzed as to what Dechert assumed would happen to the tapes, its counsel was reduced to speculation that his client may have assumed that CF would continue to use them until final dissolution and then maybe destroy them. (Apr. 23, 2014 Tr. 14-15).

unknown fate when it left the server in the Paris office without cleansing it. Moreover, it equally had to know by then that the data from the server was also implanted on the back-up tapes, for which it made no provision, and it never revisited the issue until this lawsuit was pending. Indeed, had DSI not sued, we may safely assume that Dechert would never have sought to recover its data. Finally, even if we deem Dechert's knowledge of the issue as not having been triggered until its current trial counsel was informed that the tapes were still in existence, that occurred in December 2013 (Apr. 10, 2014 Adler Decl. ¶ 6 & Ex. C), and yet defendant did not raise the issue with the court until nearly three months later, in March 2014. See, e.g., JSMS Rural LP v. GMG Cap. Partners III LP, 2006 WL 1520087, *6 (S.D.N.Y. June 1, 2006)(four months delay found to be unreasonable); Cassano, 189 F.R.D. at 86 (twelve-day delay held to be inexcusable).[11]

As for the extent of the disclosure of privileged materials, that consideration usually is addressed in the traditional

---

[11] Dechert has suggested that the disclosure to its attorneys in December 2013 was insufficient to alert it to the potential problem because its trial lawyers assumed that the tapes reflected only CF data predating the effective date of the asset purchase agreement. (Apr. 17, 2014 Miller Decl. ¶¶ 3-4). This argument does not work, since -- regardless of what trial counsel knew -- Dechert itself knew that the tapes had been in use throughout the transition period. In short, Dechert cannot hide its knowledge behind the ignorance of its trial lawyers.

26

inadvertent-disclosure context by comparing the quantity of privileged documents disclosed with the total volume of materials produced in discovery. E.g., Business Integration Servs., 251 F.R.D. at 130; Lava Trading, Inc. v. Hartford Fire Ins. Co., 2005 WL 66892, *2-3 (S.D.N.Y. Jan. 11, 2005); Cassano, 189 F.R.D. at 86; United States v. Gangi, 1 F. Supp. 2d 56, 266 (S.D.N.Y. 1998); Local 851 Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc., 36 F. Supp. 2d 131 & n. 7 (S.D.N.Y. 1998). See also Mfrs. & Traders Trust, 132 A.D.2d at 398, 522 N.Y.S.2d at 1003-04 (referring to corporate litigation involving voluminous documents). That comparison may reflect whether the producing lawyers have been notably careless or whether the inadvertent disclosure consisted of only a few documents and was the result of having to review and produce a huge volume of material, a circumstance in which isolated slip-ups may occur. That is not the case here; rather, the materials left behind by Dechert in January 2006 on the Paris server and on the tapes apparently comprised a vast quantity of data, indeed, presumably all or at least most of the communications and documents created by the new Dechert lawyers for a three-month period. Dechert's failing in this respect does not involve a lawyer's understandable overlooking of one or a few confidential documents buried in a large pile of producible materials. Rather, it reflects a failure by Dechert to make any provision for the

27

protection of a large volume of potentially sensitive materials on the server and the back-up tapes.[12]

As for the "fairness" consideration, we must take into account any potential prejudice to Dechert and its clients and weigh it against any prejudice to DSI if the relief sought by Dechert were granted. It bears mention that in the discovery context courts have cited substantial delay by the producing party in seeking relief as suggesting an absence of serious prejudice to it. E.g., Lava Trading, 2005 WL 66842 at *3. Moreover, in the same context, if the receiving party has relied in the litigation on the materials previously given to it, that suggests unfair prejudice to that party if it is then required to surrender those documents. E.g., JSMS Rural LP, 2006 WL 1520087 at *6 (plaintiff relied on documents in briefing summary judgment). The courts have also looked to

_____

[12] As noted, although the IT memo referred to the obligation of individual Dechert and CF lawyers not to access documents on the server for which they did not have client consent, that scarcely amounted to an adequate basis for Dechert to leave all of that data on the server and back-up tapes just as the CF office was disbanding and the CB firm was entering bankruptcy. Moreover, as noted, there is no indication that CF lawyers or representatives of DSI ever violated the obligations referred to in the IT memo. Rather, the tapes apparently remained unused and undisturbed until Dechert demanded production of relevant documents from the old server. Indeed, when informed that the server could not be located, Dechert initially complained that DSI (or its predecessor) might be guilty of spoliation. (Apr. 10, 2014 Adler Decl. Ex. D at 8).

28

whether the client itself had a role in failing to protect the confidentiality of the material in question. In any case, however, an assessment of what should be done in the face of an inadvertent-production claim is fact-specific and thus comes within the discretion of the district court. See, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 188 (2d Cir. 2000); see also Gangi, 1 F. Supp. 2d at 267.

In this case these traditional considerations do not lend themselves to direct application because the "disclosure", such as it was, occurred in a non-litigation context. Nevertheless we may apply general analogues to these factors. First, although Dechert's clients had no apparent say in the way that Dechert handled their privileged materials, their potential for prejudice here is minimal. As noted, these materials have reposed for nearly a decade on the back-up tapes, apparently without disclosure to anyone. At present the tapes have been reviewed for the limited purpose of identifying documents relevant to this case, all of which have been produced to Dechert and not to anyone else. Moreover, DSI represents that these produced documents do not contain any protected material, and indeed Dechert appears implicitly to concede that fact since, despite a court order to identify any documents from the tapes that come within the privilege, Dechert

29

has failed to do so even though it has received DSI's production from those tapes. Moreover, DSI represents (1) that it has deemed any attorney-client privileged material as not relevant to the issues in this case and, accordingly, has set them aside without substantive review and (2) that it has no intention of consulting or using them here. DSI has also indicated its intention to destroy or surrender the tapes once their limited use in this case has been completed. (Apr. 23, 2014 Tr. 31).

In contrast, to compel plaintiff to do what Dechert initially sought in this lawsuit would impose a potentially considerable, and unfair, burden on DSI. Initially Dechert sought an order requiring DSI to turn over the tapes, at which point DSI would review them for privilege and return any items not so covered. The problem with this demand is that the tapes contain CF documents, including privileged materials, and plainly these cannot be provided to Dechert. In defendant's latest version of its proposal, DSI would be required to produce to Dechert a copy of the tapes, cleansed of the CF materials, and to destroy the original tapes or any other copies it has of Dechert material, and Dechert would then review the tapes for privilege and thereafter provide some universe of non-protected materials from the tapes to DSI. Because of the amount of material on the tapes, this too may prove a substantial

burden for DSI. Moreover, it promises the prospect of extended potential litigation over privilege issues even though DSI has conceded that the privileged materials are not relevant to the case.[13] Moreover, any such burden would be particularly unfair to DSI since it would be directly traceable to Dechert's original decision to place on the server, and thus on the back-up tapes, the privileged materials of its own firm alongside those of CF, and its subsequent failure to arrange for any post-transition method for disentangling those materials.

Under all of the circumstances, including Dechert's own failings in 2005 and 2006, the conceded irrelevance of the privileged materials to this case, the stated willingness of DSI to destroy the tapes, the absence of any articulated need by Dechert for the tapes (other than to review them for privilege claims) and the burdens that would be unnecessarily imposed on the parties and the court if Dechert's motion were granted, we decline to order such relief. Instead, we direct the following:

1. DSI and its counsel are to refrain from any further review

---

[13] Dechert has not disputed this proposition. Moreover, it presumably has its own copies of any such privileged materials since the new Dechert attorneys are likely to have retained copies of all such documents when they left the Paris office in January 2006.

of Dechert materials on or from the tapes other than copies of what it has produced to Dechert.

2. At the conclusion of the litigation, DSI and its counsel are to destroy the tapes and any copies of Dechert materials derived from the tapes.

3. DSI and its counsel are to refrain from communicating to anyone the substance of any Dechert documents that have not been produced to Dechert.

4. Plaintiff is to submit to the court within seven days a proposed order to effectuate the rulings of this court. Defendant may submit a proposed alternative order within three days if it objects to the version proffered by plaintiff.

Dated: New York, New York
       July 30, 2014

_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

32

Copies of the foregoing Memorandum and Order have been mailed today to:

David J. Adler, Esq.
McCarter & English, LLP
245 Park Avenue
27th Floor
New York, New York 10167

Joel M. Miller, Esq.
Miller & Wrubel P.C.
570 Lexington Avenue
New York, New York 10022