UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

DEVELOPMENT SPECIALISTS, INC., in its
capacity as Plan Administrator for Coudert
Brothers LLP,

          Plaintiff,

     -against-

DECHERT LLP,

          Defendant.
———————————————————————x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   5|7|15
```

No. 11 Civ. 5984 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO PRECLUDE, FOR A PROTECTIVE ORDER, AND TO DISMISS

McMahon, J.:

     Plaintiff Development Specialists, Inc., in its capacity as Plan Administrator for Coudert Brothers LLP, brings this action against Defendant Dechert LLP for avoidance and recovery of fraudulent transfers, turnover of profits, unjust enrichment, and an accounting. Before the court is Docket #155, Defendant Dechert's motion, which requests the following relief: (1) an order pursuant to Rule 15(a) precluding Plaintiff from pursuing an accounting claim based on the theory that certain former Coudert Brothers partners delayed recording and billing work in progress performed while at Coudert Brothers until after they joined Dechert; (2) a protective order pursuant to Rule 26(c) prohibiting Plaintiff from taking discovery regarding Dechert's billing of work in progress for August and September 2005 and regarding negotiations between the departing partners and Dechert; and (3) an order dismissing counts 2, 4, 6, 7, and 8 of the amended complaint.

     For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**.

1

## BACKGROUND

### I.     The Fall of Coudert Brothers

This action arises out of the bankruptcy of Coudert Brothers LLP ("CB" or "Debtor"), a New York law firm partnership first organized in 1853. (Compl. ¶ 7.) CB's affairs are governed by a detailed partnership agreement dated December 30, 2004. (*Id.*)

CB operated in France as Coudert Freres ("CF"), also a New York partnership. (*Id.* ¶ 8.) CF and CB were "Related Partnership[s]" under Article 4(b) of the CB partnership agreement, and they operated as a worldwide partnership, sharing profits and losses and reporting financial statements on a consolidated basis. (*Id.* ¶¶ 9-10.) Partners of CF were also partners of CB and partners of CB were also partners of CF. (*Id.* ¶ 9.)

In or about 2004, CB experienced declining profits per partner and began considering "potential strategic alternatives." (*Id.* ¶ 12.) At some point in 2005, CB's Executive Board directed that an orderly dissolution analysis be prepared. (*Id.* ¶ 13.) The Board received that analysis on or about June 9, 2005. (*Id.*) The analysis projected a deficit of $30.4 million. At that time, CB owed approximately $24.5 million to secured creditors (Citibank and JP Morgan) and approximately $3 million in unsecured bank loans. (*Id.* ¶ 14.) CB was, in other words, insolvent.[1] (*Id.*)

On August 16, 2005 ("Dissolution Date"), the equity partners of CB voted to wind down the business of the firm and sell the firm's assets to realize their maximum value. (*Id.* ¶ 15.) The dissolution triggered the "wind down" phase of the Debtor, but it did not terminate the partnership; CB remains in existence today. (*Id.*)

---

[1] The complaint does not specify if this deficit was a projected annual deficit for the coming year or the firm's net present value.

According to the complaint, Defendant Dechert entered an asset purchase agreement with Coudert[2] (the "Paris Transaction") on October 3, 2005, or two months after dissolution. (*Id.* ¶ 16.) The sum and substance of the transaction was that CB transferred cash, receivables, Paris office space, and its Paris law library to Defendant, in return for which Dechert offered employment to all associates employed by CF in Paris, paid CB some $248,024 for use of the Paris facilities and €50,000 for the contents of CB's law library, and assumed CB's obligations for remuneration and employee benefits accruing to employees of the Paris office after October 5, 2005. (*Id.* ¶¶ 17, 23.) In connection with the Paris Transaction, several CF partners withdrew from that firm and joined Dechert. (*Id.* ¶ 18.)

CB did not sell or transfer any of its rights to recover fees or profits generated from its client matters that remained pending on the Dissolution Date as part of the Paris Transaction. (*Id.* ¶ 19.) The asset purchase agreement governing the Paris Transaction did, however, include a release clause that reads:

> Coudert, on behalf of itself and its partners, waives and releases any claim it may have against Dechert or its partners arising from, or relating in any way to, [] the withdrawal of the Paris Partners or other Paris legal and non-legal staff from Coudert and or their admission as partners of Dechert or otherwise becoming employed by Dechert (provided, however, that the foregoing shall not apply to any obligations of Dechert under this Agreement) . . .. (*Id.* ¶ 21.)

CB also maintained offices in Belgium. The Paris Transaction and the agreement governing it do not relate to the Belgium offices. Nonetheless, after the Dissolution Date, five partners left CB's Brussels office and joined Dechert as partners. (*Id.* ¶ 24.) Four of these partners – René Gonne, Pierre-Manuel Louis, Harold Minjauw, and Fabrice Mourlon – withdrew from CB on

---

[2] The complaint does not state whether CB, CF, or both was or were a party or parties to the asset purchase agreement. For our purposes that is not relevant.

3

September 2, 2005. (*Id.*) A fifth partner, Eric Deltour, withdrew on September 30, 2005. (*Id.* ¶ 24.)[3]

When those partners left CB there were many client matters pending in the Brussels office. (*Id.* ¶ 25.) After the former CB partners from the Brussels office joined Dechert, Defendant was retained to conclude some of them. (*Id.*)

## II.     The Current Lawsuit

### A.     Plaintiff's Original Theory and the Appellate Process

Development Specialists ("Plaintiff"), as administrator of CB's estate, sought to maximize the value of that estate by, inter alia, filing this adversary proceeding against Dechert and other law firms, to recover alleged property of the estate wrongly transferred to other parties. This court has withdrawn the reference to the Bankruptcy Court in this matter. (Docket #13). The Administrator's principal theory of recovery – asserted in Counts 6-8 of its complaint – was that the unfinished "billable hours" business of CB and CF on the Dissolution Date was "property" of the firm within the meaning of Article 40 of the New York Partnership Law, for which CB's former partners – and, ultimately, the law firms where they landed – were accountable to the estate. That contention – which had been accepted by this court in this action, *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 477 B.R. 318, 322 (S.D.N.Y.) *opinion amended and superseded*, 480 B.R. 145 (S.D.N.Y. 2012) *rev'd in part, vacated in part sub nom. In re Coudert Bros. LLP*, 574 F. App'x 15 (2d Cir. 2014), but rejected by my colleague Judge Pauley in another law firm bankruptcy matter, *Geron v. Robinson & Cole LLP*, 476 B.R. 732, 735 (S.D.N.Y. 2012) *aff'd sub nom. In re Thelen LLP*, 762 F.3d 157 (2d Cir. 2014) – was rejected by the New York Court of Appeals, ruling on a certified question from the United States Court of Appeals for the

---

[3] (In a declaration submitted in support of this motion, Deltour states that he did not withdraw until October 10, 2005. (Deltour Decl. ¶ 12.))

Second Circuit. Specifically, the New York Court of Appeals "h[e]ld that pending hourly fee matters are not partnership 'property' or 'unfinished business' within the meaning of New York's Partnership Law." *In re Thelen LLP*, 24 N.Y.3d 16, 22 (2014). Consequently, "A law firm does not own a client or an engagement, and is only entitled to be paid for services actually rendered." *Id.* The Court of Appeals did observe, however, that a law firm partnership's property *does* include "yet-unpaid compensation for legal services already provided." *Id.* at 29.

After the New York Court of Appeals issued its opinion, the Second Circuit ordered briefing on the Court of Appeals' decision's effect on final resolution of the case before the Circuit. *See* Order, *In re Coudert Bros. LLP*, No. 12-4916 (2d Cir. Aug. 7, 2014), ECF #155.

Dechert filed a letter brief, *see* Miller Letter, *In re Coudert Bros. LLP*, No. 12-4916 (2d Cir. Aug. 25, 2014), ECF #158, arguing that the Second Circuit should reverse this court's grant of summary judgment in favor of Plaintiff, vacate its dismissal of counts 7 and 8 of the complaint (which had been dismissed because an accounting was the proper cause of action for the relief sought by Plaintiff), and remand to the district court with an instruction to dismiss counts 6 through 8 of the amended complaint. *Id.*

Plaintiff urged a different result. *See* Adler Letter, *In re Coudert Bros. LLP*, No. 12-4916 (2d Cir. Aug. 25, 2014), ECF #159. Plaintiff noted that, "a number of pending claims, including fraudulent transfer claims against defendant Dechert (involving Dechert's acquisition of the Paris Office of Coudert) . . . will proceed before the District Court[,]" *id.* at 2, and argued that additional "issues remain concerning [Plaintiff]'s accounting claims which preclude the reversal" of this court's judgment. *Id.* at 2. In particular, Plaintiff noted that each of the complaints it filed against various law firms "alleges that the [sic] Coudert's books and records reflect unpaid accounts receivable and work in progress as of September 1, 2008 for matters in which one of the

Withdrawing Partners was the responsible partner." *Id.* at 2-3. "These amounts," Plaintiff explained, "represent a property interest of Coudert[,]" notwithstanding the Court of Appeals' decision." *Id.* at 3. In a footnote, Plaintiff also mentioned an accounting claim "against Dechert as a result of five Belgian partners who joined Dechert[,]" *id.* at 2 n.3, but did not elaborate on the nature of that claim.

Plaintiff's argument was that CB partners left CB without collecting fees for work they had already performed at CB, which unbilled work was eventually billed and collected by their new law firms. Although the law firm defendants (including Dechert) insisted that they had never billed for services they did not perform, Plaintiff argued that it was entitled to take discovery to determine whether that representation was accurate. *Id.* at 3-4. According to Dechert, this was an entirely new argument – one that did not preclude dismissal of counts 6-8.

The Second Circuit had no interest in getting involved in such a dispute. It remanded the case to this court so that I could consider, in the first instance, whether DSI may proceed on any of the dismissed claims and whether any part of its claim for an accounting survived the New York Court of Appeals' decision. *See In re Coudert Bros. LLP*, 574 F. App'x 15 (2d Cir. 2014).

During the lengthy appellate process relating to the "unfinished business" counts, Defendants moved to dismiss counts 1 through 5 of the complaint (which motion I denied) and the parties proceeded with discovery relating to those counts. I also issued an order substantively consolidating the assets and liabilities of CF and CB for purposes of this action. (Docket #89.) The issue raised by the instant motion is whether there is anything left of counts 6, 7, and 8 of DSI's complaint as pleaded.

## B.     Proceedings on Remand

After the Second Circuit issued its decision, Dechert submitted a letter arguing that, in light of the Second Circuit's decision, counts 6, 7, and 8 of the complaint should be dismissed. (Docket #151.)

Plaintiff responded by letter on November 12, 2014 (Docket #153). Plaintiff's letter raised – for the first time in this court – the allegations at issue in this motion.

According to Plaintiff, on September 19 or 20, 2005, Dechert extended offers to each of the five Belgian partners who moved from CB to Dechert, and those former CB partners became partners of Dechert on or about October 6, 2005. Plaintiff asserts, however, that these partners stopped working on behalf of CB much earlier, in August and September 2005 – during which time they billed almost no time on pending client hours. Plaintiff theorizes that, notwithstanding the lack of billings, these partners actually worked on CB client matters during August and September 2005, and simply delayed recording their hours or billing that work until after they joined Dechert.

The November 12 letter cites several pieces of evidence that allegedly support Plaintiff's theory.

First, Plaintiff cites a spreadsheet attached to an email sent by Pat Kane, CB's then Executive Director, on October 18, 2005, which records either zero or only a handful of billed hours for each of the partners in question during August and September 2005. DSI notes that timekeepers at CB were required to bill 8 hours per day.

Second, Ms. Kane testified at her deposition that the declining billable hours in the Brussels office were a "red flag," because the partners in that office had historically been rainmakers for the firm.

7

Third, CB's CFO, Brian Rees, testified at his deposition that several partners at the Brussels office were not billing time in amounts that reflected their normal productivity.

Plaintiff argues that these allegations warrant additional discovery; Plaintiff has not taken any discovery concerning client matters transferred to Dechert from Coudert's Brussels office.

In its letter, Plaintiff also asserted that there are "overlapping factual issues among DSI's claims as they relate to the two offices which joined Dechert." The letter does not make the nature of that overlap entirely clear. Plaintiff noted that Eric Deltour, a departing partner from the Brussels office, also served as a member of CB's Executive Board, and was involved in persuading a committee of that Board to close the Paris transaction with Dechert. Plaintiff insinuates (but does not come out and say) that Deltour – hoping to leave CB for Dechert – had a motive not to bill time while at CB and to push the Paris transaction even though the transaction was not in CB's interest. Thus, Plaintiff argued that it should be permitted to take additional fact discovery concerning the relationship between the Brussels unfinished business claims and the Paris transaction.

I held a telephone conference with the parties at which I ordered Dechert to file any motion to preclude within ten days. Dechert did so and that motion is now before the court.

## DISCUSSION

In my view, the disposition of this motion – which seeks several forms of relief[4] – turns on several interrelated questions.

First, do the claims asserted in counts 6, 7, and 8 of the DSI complaint encompass Plaintiff's allegations about the Brussels office as described in its recent letter to the court? If so,

_____

[4] One of those forms of relief is for the dismissal of counts 2 and 4. All parties agree that those claims – which were pleaded in the alternative – should be dismissed.

8

then I must decide whether those allegations state a claim on which relief may be granted. That showing is required under *Twambly/Iqbal* before Plaintiff may take discovery.

Second, if the complaint does not encompass Plaintiff's allegations about the Brussels office, should Plaintiff be allowed to amend the complaint to assert that new theory?

After reviewing the complaint and the parties' submissions, I conclude that Plaintiff's complaint does encompass the allegations about the Brussels office and that those allegations state a plausible claim for relief – even if only barely. Thus, Plaintiff is entitled to take discovery concerning the Brussels partners' use of partnership property, as described below.

## I.   A Claim for An Accounting Survived the Court of Appeals' Decision

Count 6 of the Amended Complaint asserts a claim for an accounting for any and all revenues that Dechert has collected on account of any "Unfinished Business" that was transferred to Dechert by a withdrawing Coudert partner. Count 7 seeks a turnover of the proceeds related to any such Unfinished Business. And Count 8 assets a claim for unjust enrichment to the extent that Dechert received any benefit that should have gone to Coudert.

As far as this court is concerned, counts 6, 7, and 8 of plaintiff's complaint assert a claim for an accounting for whatever is rightfully CB's money. Some portion of that claim necessarily remains after the decision of the New York Court of Appeals. That court, having disposed of the question certified to it – were unfinished client matters "property" of the dissolving law firm? – went out of its way to observe that a dissolving law firm partnership's property *would* include "yet-unpaid compensation for legal services already provided." *In re Thelen LLP*, 24 N.Y.3d at 29. So to the extent that Dechert collected money rightfully belonging to Coudert – because it was payment for work done while a partner was a member of Coudert – the claim survives.

Of course, DSI argued for a much more expansive definition of Unfinished Business. It lost on that issue – and with that loss, it lost most of the value of the claims asserted in Counts 6,

9

7, and 8. But DSI retains a limited claim for an accounting. And if some faithless former Coudert partner managed to transfer onto Dechert's books time charges for work actually performed while that partner was still a member of Coudert, then that partner, and his new law firm, must account to the estate for the value of that work, or be found unjustly enriched.

Such a claim is fairly comprehended by counts 6, 7, and 8 as pleaded, since the pleading alleges that, after withdrawing from CB, the withdrawing partners "transferred Unfinished Business to Dechert." (Compl. ¶ 28.) That term originally encompassed both client matters that moved with the Brussels partners to Dechert and money owing to CB on account of work performed by those partners while they were still at CB. The change resulting from the Court of Appeals' decision is that the term "Unfinished Business" is now limited to work performed by the withdrawing partners during their tenure as partners of Coudert, but not billed by Coudert or paid to Coudert's estate.

It is true that Plaintiff's complaint does not specifically allege that the former CB Brussels partners performed work in August and September 2005 that they failed to record on CB's books, or that those former CB partners billed time at Dechert for work they performed while at CB. But that is of no moment. The particulars supporting the existence of such a claim did not become apparent until the parties began depositing witnesses, at which point several CB executives described the sharp decline in the Brussels partners' hours. (Docket #112 at 2-3.) Only then – once the witnesses contrasted the August/September 2005 performance with these partners' prior work – did the Plaintiff possess a "plausible" (to use *Twombly-Iqbal* language) basis to assert that the Brussels partners had in fact not discharged their duty to their old law firm.

Were amendment of the pleading necessary, this court would be inclined to grant it. True, this is an ancient bankruptcy, and it is well past time for the matter to conclude. However, DSI

10

cannot reasonably be accused of delay; there was a multi-year stay of proceedings relating to the unfinished business claims of counts 6, 7, and 8.

However, no amendment is necessary. It is hornbook law that a dissolving partnership is entitled to an accounting from each of its departing partners. *See 220-52 Associates v. Edelman*, 241 A.D.2d 365, 367 (1st Dep't 1997); *Shandell v. Katz*, 95 A.D.2d 742, 743 (1st Dep't 1983); nothing in the Court of Appeals' decisions altered that rule. The only question was the scope of what constituted partnership property. DSI asserted an aggressive new theory of what the term "property" encompassed and litigated that theory vigorously. But the fact that that effort ended in failure did not disentitle Plaintiff from obtaining an accounting on a narrower understanding of what constituted "partnership property." And immediately upon remand, DSI asserted a basis for concluding that Dechert had (albeit unwittingly) obtained property of the very sort that the New York Court of Appeals held belonged to the dissolving partnership, CB and CF.

Defendant argues that the complaint does not encompass Plaintiff's allegations about the Brussels office, because the current accounting claim seeks "profits" but the new theory seeks "all revenues" for work performed by CB partners. I am not persuaded. An accounting is a traditional equitable remedy that requires a person who misappropriates the property of another to explain (account for) the funds and to return what is not rightly his. *See Roslyn Union Free Sch. Dist. v. Barkan*, 16 N.Y.3d 643, 653 (2011); 1A C.J.S. Accounting § 6. Being equitable in nature, the scope of relief available can vary with the facts. But however Plaintiff expressed the relief requested in the complaint, the nature of the claim was and is a broad one: Plaintiff sought to hold Dechert accountable for any misappropriation of what was by rights Plaintiff's property.

Before turning to the remaining arguments, I want to emphasize the narrow scope of Plaintiff's claims for accounting, turnover of profits, and unjust enrichment. I am not requiring

11

Plaintiff to amend its complaint, but I will not permit Plaintiff to exploit that fact by smuggling in additional theories down the line. Plaintiff's accounting claim is now limited to work performed by former partners and associates at CB's Brussels office during the months immediately prior to their departure for Dechert, which work was not recorded or billed at CB but was instead recorded and billed at Dechert. Plaintiff may proceed with counts 6, 7, and 8 on that theory and none other.

## II.    Plaintiff's Allegations State a Claim for Relief

Having determined that the complaint as pleaded encompasses Plaintiff's allegations about the Brussels office I must now determine if those allegations support a claim for relief.

### A.    Plaintiff's Allegations and Claims are Plausible

Defendant's argues that Plaintiff's claim for relief – at least as explained in Plaintiff's November 12, 2014 letter to the court and in the papers filed in response to Defendant's motion – is not plausible and thus Plaintiff fails to survive the Supreme Court's standard for motions to dismiss under *Twombly/Iqbal*.

Defendant's heavily fact-bound argument proceeds as follows. In December 2005 the departing members of CB's Brussels office signed an agreement with CB in which the departing partners purchased that office's accounts receivable for a fixed price. (Deltour Decl. Ex. 1 § 1(a)-(b).) The agreement also obligated the departing partners to act, in effect, as collection agents for amounts billed on work in progress. (Deltour Decl. Ex. 1 § 1(d).) Collections resulting from that billing were to be divided between the departing partners and CB. (Deltour Decl. Ex. 1 § 1(d)(iii).) According to Dechert, the outstanding receivables and work in progress were comprehensively listed in four spreadsheets appended to the agreement.

Dechert argues that this agreement was negotiated by sophisticated partners, including CB's Executive Director and its former Chairman, who would never have agreed to the terms or signed the agreement if they harbored any suspicions that departing partners were defrauding the

12

firm by failing to record and bill work performed while they remained at CB. Certainly, they would not have signed off on the appended spreadsheets, which purported to comprehensively list outstanding work in progress and accounts receivable.

Dechert asserts that Plaintiff's claim is also implausible because it is illogical. In particular, Dechert claims that the departing partners would not have risked their careers and professional reputations in order to bring two months of billings to their new firm. In any event, the departing partners' financial stake in any deception would actually disfavor the alleged misconduct, according to Dechert, because those partners would stand to gain only a small fraction of any work recorded and billed at Dechert. In contrast, the departing Brussels partners would obtain a substantial cut – at least 20% – of collections on work in progress that they recorded for and billed to CB. (Deltour Decl. Ex. 1 § 1(d)(iii).)

Finally, Dechert states that there is no evidence of intentional wrongdoing. Even if there are gaps in the timesheets of the departing partners, and emails admonishing the former CB Brussels partners (in particular, Eric Deltour) to complete their time, no one working for CB ever insinuated intentional wrongdoing, rather than merely careless billing habits.

Dechert admits that the hours billed by the departing partners dropped precipitously in August and September 2005, but it says there are plausible and persuasive explanations for that. All the partners spent that time looking for other firms to join. Some went on vacation, as Europeans are wont to do in August, at least one faced a personal crisis, and all had to devote substantial time to winding up CB's operations – time not recorded or billed to any single client. Further, all except Deltour left the firm on September 2, which (I agree with Dechert on this point) provides a quite compelling reason that those partners billed no time to the firm in September.

13

Dechert's arguments have considerable persuasive force. But Rule 8 does "not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal" wrongdoing. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The facts to be alleged by Plaintiff are more than "merely consistent with" Dechert's liability and thus they "nudge[ its] claims . . . across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009) (internal citations and quotation marks omitted).

First, it is undisputed that the former CB Brussels partners recorded substantially fewer hours on client matters in August 2005 than in months immediately before August 2005, and recorded almost no time whatever in September 2005. (Adler Decl. Exs. 9, 11.) Although they recorded little time on client matters, communications with and from those same partners show that they were indeed working on client matters during the two months in question. Eric Deltour, for example, was repeatedly admonished for failing to record time admittedly spent on client hours in September 2005. (Adler Decl. Exs. 18-21.) And a contemporary email from Deltour himself dated September 23, 2005 confirms that Deltour had a "large closing" the following week. (Adler Decl. Ex. 22.) Another partner, Rene Gonne, referred in a June 23, 2005 email to important developments involving a major European client over the next few months. (Adler Decl. Ex. 23.)

Dechert does not deny that the partners recorded few hours in August and September 2005. In fact, it does not even deny that those partners may have failed to record time worked on client matters during those months. Instead, Dechert suggests that the drop in hours can be explained by the frantic conditions accompanying the dissolution of CB and the partners' departure for Dechert. Possibly so. But there are other plausible inferences to be drawn from those facts, including the inference that the Brussels partners delayed recording the time worked in August and September

14

until they arrived at Dechert. Dechert's explanation is certainly not implausible. It is simply one among several plausible inferences.

Second, I disagree with Dechert that there was no plausible motive for the departing Brussels partners to delay recording and billing work they performed while at CB. Plaintiff has pointed to several communications showing animosity between the departing Brussels partners and other CB leaders. The Brussels partners felt they were carrying the firm without adequate compensation. Thus they proposed an arrangement under which they would operate largely independent of the rest of CB and retain much of the revenue they collected rather than sharing it with the rest of CB. (Adler Decl. Ex. 5.) After the CB executive board responded with a counter-proposal, (Adler Decl. Ex. 6), Brussels partner Gonne stated that the counter-proposal's reception was "not positive." (Adler Decl. Ex. 7.) When discussion on those proposals ended in May 2005, Gonne sent an email to the CB executive board, clearly expressing his view that the Brussels partners were exploited without fair consideration by the firm: "the firm rely on us to fuel the machine during the time necessary to organize a structure of which we will not be a part." (Adler Decl. Ex. 8.) When Gonne ultimately resigned as a partner of CB on September 2, 2005 his letter to the board listed a variety of grievances including "negligence in the management of the Firm," "breaches of fiduciary duty," and "misleading negotiation between three Board members . . . and the Belgian offices . . . with the purpose of playing for time . . .." (Adler Decl. Ex. 10.) The other departing partners sent similar resignation letters reflecting the same grievances. (Adler Decl. Ex. 10.)

It is reasonable to believe that those partners, feeling slighted by CB, would elect not to record and bill time for the firm's benefit. Also, those partners might feel a desire to burnish their credentials at their new firm (Dechert) by bringing in former CB clients and immediately billing

15

substantial time on those matters. Whether those incentives override the competing considerations – an ongoing fiduciary obligation and the risk of professional sanction – is a question of fact that cannot be resolved on a motion to dismiss.

Nor do any of Dechert's other arguments persuade me that Plaintiff's new theory of liability is so implausible as to be precluded under *Twombly/Iqbal*. Dechert repeatedly emphasizes that CB, acting through its Executive Director and former Chairman, signed the December 2005 agreement. That agreement, according to Dechert, purported to comprehensively resolve claims on accounts receivable and work in progress with the Brussels partners. Dechert claims that an agreement would never have been reached if CB officers suspected wrongdoing, especially since CB executives were aware that time records for the last months of work in Brussels were missing; that is why Pat Kane, the former Executive Director of CB, repeatedly emailed Eric Deltour, asking him to enter missing time.

I draw no inference against Plaintiff from the fact that CB leadership did not suspect intentional wrongdoing in 2005. Furthermore, the December 2005 agreement contains no waiver of liability as against the former CB partners. Quite the opposite: the agreement provides that "Nothing in this Agreement shall constitute a waiver or release of any rights that CB or any of the Brussels Partners may have against the other Party except as specifically set forth herein." (Deltour Decl. Ex. 1 § 8(i).) Although I do not read the reservation of rights as signifying that CB management actively distrusted the Brussels partners, it indicates that the December 2005 agreement was not intended to be the final word on the Brussels partners' liability.

## B.    Dechert May Be Held Jointly Liable

Dechert next asserts that, even if Plaintiff's theory were plausible, *it* (Dechert) cannot be held jointly liable for the misconduct allegedly committed by the departing Brussels partners.

New York Partnership Law provides that:

16

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act. N.Y. P'SHIP LAW § 24.

Section 25 of the Partnership Law further provides that:

The partnership is bound to make good the loss:

(1) Where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and

(2) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership. N.Y. P'SHIP LAW § 25.

Dechert argues that neither section allows it to be held jointly liable for the misconduct alleged by Plaintiff, because Dechert was not involved in negotiating the collection of amounts owed for work in progress or accounts receivable and because Dechert never authorized the departing Brussels partners to hide their assets. Those partners, in other words, were not acting within the scope of their employment or the "ordinary course of the business of the partnership."

This argument also fails. First, Dechert may be jointly liable for the Brussels partners' individual conduct even though other partners of Dechert never authorized that conduct. That is clear from the text of Partnership Law § 24, which contemplates partnership liability for action *either* "in the ordinary course of the business of the partnership, *or* with the authority of his copartners." (emphasis added). Thus, it does not matter that Dechert never authorized the Brussels partners to record and bill time at Dechert for work actually performed while the partners were still at CB. The question of authorization is distinct from the question of ordinary course of business.

Second, it is clear that the actionable misconduct alleged here was committed in the ordinary course of business. Recording and billing time are quintessential ordinary business

17

activities of law firms. Defendant argues that what is alleged – essentially theft of CB's work in progress for the benefit of another – is not part of the ordinary course of business of a law firm. But this argument proves too much. Under that reasoning no law firm would ever be liable for an attorney's intentional misconduct, because fraud is not a part of the law firm's business. That is plainly not the case, since partnerships are often held liable for an individual partner's fraud. *Kravetz v. Brukenfeld*, No. 83 CIV. 5357 (GLG), 1984 WL 2443, at \*2 (S.D.N.Y. June 29, 1984); *Matter of Klenk*, 204 A.D.2d 640, 642 (2d Dep't 1994).

Nor, as Defendant argues, would holding Dechert liable under DSI's theory make the firm liable to CB for any misconduct committed by Dechert partners after they left Coudert and affiliated with Dechert. Had the Brussels partners broken into CB's old offices and stolen computers, for example, Dechert would not be liable, because such activity bears no relation to normal law firm business. Billing clients, even if done fraudulently, is in the ordinary course of business for a law firm.

## III.    Defendant's Motion for a Protective Order Is Granted in Part and Denied in Part

Defendant also seeks a protective order precluding Plaintiff from taking discovery about (1) the recording and billing of work in progress for August and September 2005 by Dechert, and (2) negotiations between the Brussels Partners and Dechert.

The protective order is denied with respect to recording and billing of work in progress for August and September 2005 by Dechert.

As to the second aspect of the motion for a protective order: In its November 12, 2014 letter to the court, Plaintiff suggests that it needs to take discovery concerning the Brussels partners' involvement in the Paris transaction. Plaintiff argues that – even putting aside its unfinished business claims against the Brussels partners – this discovery might inform its

18

fraudulent conveyance claims regarding the Paris transaction, by somehow revealing a connection between the Brussels partners' departure to Dechert and the value of the assets transferred.

Defendant's motion for a protective order is granted with respect to this issue. Plaintiff may not undertake a fishing expedition of discovery in the hope of finding evidence of some heretofore unimagined connection between the Paris transaction and the Brussels office.

First, discovery concerning this subject is untimely. Although discovery on the unfinished business claims was stayed while the partnership property issue percolated through the courts, discovery about the Paris transaction was not stayed during that lengthy period. Plaintiff says that discovery about negotiations between the Brussels partners and Dechert would provide material relevant to the Paris claims; such discovery could and should have been taken long ago. Plaintiff's response is that it only became aware of a possible connection between Brussels and Paris after taking initial discovery, but there was plenty of time to pursue any suggestion that there was a relationship between the Dechert/Brussels negotiations and the Paris transaction after "initial discovery."

Second, plaintiff does not make a persuasive case that discovery about the negotiations between Dechert and the Brussels partners is likely to lead to the discovery of material relevant to the Paris transaction. Plaintiff points to emails by Eric Deltour and other members of the Special Situation Committee of CB in which Deltour advises the Committee to approve the Paris transaction. Not one of these emails suggests anything about the value of the deal to CB. Only one email even hints at a connection between CB's Belgium offices and the Paris transaction, and that email says *nothing* about the relationship between the Paris transaction and the Brussels partners' departure for Dechert. Plaintiff's reasoning here amounts to nothing more than this: Eric Deltour was involved in the Paris transaction and he is the subject of the remaining unfinished business

19

claims. Dechert is connected to both the Paris transaction and the unfinished business claim. Therefore, there must be some heretofore unsuspected connection between the two. That type of logically fallacious reasoning affords no basis to reopen discovery into the Paris transaction.

## IV.   Defendant's Motion to Dismiss Counts 2 and 4 is Granted

Plaintiff admits that counts 2 and 4, which concern the Paris transaction, should be dismissed. Those claims were pleaded in the alternative if CB and CF were not substantively consolidated for purposes of this lawsuit. The court granted Plaintiff's motion to substantively consolidate the assets and liabilities of CB and CF. (Docket #89.) Counts 2 and 4 are, therefore, dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**. The Clerk of the Court is directed to remove Docket #155 from the Court's list of pending motions.

The parties have until Friday, June 19, 2015 to complete fact discovery related to the Brussels office. By the end of next week, May 15, 2015, the parties should submit a schedule for completing expert discovery within two months. By the end of July, all discovery should be over, and what remains of this matter ready for trial. It will take priority over all but criminal trials on my trial calendar.

Dated: May 7, 2015

Colle M. Mcl

U.S.D.J.

BY ECF TO ALL COUNSEL

20